UNITED STATES *v.* ASTRA BENTWOOD FURNITURE CO. (No. 4078)[1]

United States Court of Customs and Patent Appeals, February 7, 1938

*Joseph R. Jackson*, Assistant Attorney General (*Joseph E. Weil*, special attorney, of counsel), for the United States.

*Allan R. Brown* (*Eugene F. Blauvelt* of counsel) for appellee.

[1] T. D. 49434.

[Oral argument October 5, 1937, by Mr. Weil and Mr. Brown]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court: [1]

The appellee imported articles which were entered as "17 cases iron wood screws." They were classified by the collector under paragraph 397 of the Tariff Act of 1930 as articles composed wholly or in chief value of metal, at 45 per centum ad valorem.

The importer protested, claiming the goods to be dutiable, first, at 25 per centum ad valorem under paragraph 338 of said act as "screws, commonly called wood screws," and, alternatively, at 1 cent per pound under paragraph 330 of said act as "bolts, with or without threads or nuts." There was also a suggestion in the protest that further reduction of the dutiable rate should be governed by any rate secured by virtue of any treaty or trade agreement with the country of production, but, as nothing appears further in the record as to any treaty or trade agreement, this element does not enter into the controversy now before us. As shown by the Summary of Entered Value, the weight of the imported merchandise was 3,680 pounds.

The United States Customs Court found on the record that the imported articles were not commonly called wood screws, and hence could not be included within the purview of said paragraph 338. It held further, however, that the importer had maintained the burden of proof as to its claim that the articles were bolts, under said paragraph 330, and, therefore, sustained the appellee's claim thereunder and gave judgment therefor. From that judgment the Government has appealed, claiming that the articles were not bolts, and that the claim under said paragraph 338 could not now be pressed, because the importer had filed no cross-appeal as to that finding, and that, therefore, they were properly classified by the collector as manufactures of metal, under the general clause.

The paragraphs involved are as follows:

PAR. 330. Nuts, nut blanks, and washers, of wrought iron or steel, six-tenths of 1 cent per pound; bolts, with or without threads or nuts, and bolt blanks of iron or steel, 1 cent per pound; spiral nut locks, and lock washers, of iron or steel, 35 per centum ad valorem.

PAR. 338. Screws, commonly called wood screws, of iron or steel, 25 per centum ad valorem.

PAR. 397. Articles or wares not specially provided for, if composed wholly or in chief value of platinum, gold, or silver, and articles or wares plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 65 per centum ad valorem; if composed wholly or in chief value of iron steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal,

[1] The opinion in this case was prepared by Graham, late Presiding Judge, it being the last opinion submitted by him in a customs case. It was adopted by a majority of the court, with a few minor changes, subsequent to his death, which occurred November 10, 1937.

but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 45 per centum ad valorem.

The testimony as to the character and name of the articles of importation in this case was furnished by three witnesses.

Frank J. Mano, manager of the appellee, has been with his company since 1920, and before that was engaged in the sale of this line of goods. He stated that the articles of importation represented by Exhibits 1 and 2 were purchased by his company in large quantities, under the names of "lag bolts," "coach screws," and "lag screws"; that they were used by appellee for the purpose of fastening parts of wooden furniture together; that Exhibits 1 and 2 were identical and were never used except in wood; and that screws for use in wood have a different thread than those for use in metal—that a wood screw makes its own thread as it is screwed into the wood, while a metal screw requires a hole to be bored for the threads to fit.

On cross-examination, these questions and answers appear in the record:

X Q. You say this is a wood screw; is that correct?—A. This is the term by which it is known, as a wood screw. * * * There are several names for it.

By Mr. Weil:

X Q. You say this, Exhibit 1, can be called a lag screw?—A. Yes.

X Q. And it is called a lag screw?—A. It is called a lag screw.

X Q. You say it is also called a wood screw?—A. Yes; and also called a lag bolt, and also a coach screw.

X Q. Also called a coach screw?—A. Yes.

X Q. So when I say to you the terms are interchangeable, wood screw, coach screw, lag bolt; is that correct?

*     *     *     *     *     *     *

—A. They are interchangeable.

Following this testimony, the witness, in answer to an inquiry from Judge Tilson, stated: "Your Honor, this is called a wood screw."

Oscar Linke, a witness for, and factory superintendent of, the importer, and in the business of manufacturing bentwood chairs for thirty years, stated that he was familiar with the name and use of the imported articles, and that they were called by different names. He stated that they were bolts, and showed how they were used to attach various parts of the wooden furniture together, and that the imported articles were sometimes called "lag bolts," sometimes "lag screws," and sometimes "coach screws." He stated this: "If a salesman comes around and he offers it as lag bolt or offers it as coach screw, whatever expression he uses, I know it is this screw." When asked to define a "wood screw," the witness stated that a wood screw was a screw manufactured with a "proper thread for being used in wood." He further stated that a wood screw does not always have a slot, and that he orders according to the phraseology used by the salesman, adding: "If he calls them bolts, I order bolts."

The importer also called the witness Edward A. Derby, for twenty years a salesman of bolts, nuts, and screws, and acquainted with the wholesale trade in these articles. The witness stated that he had sold merchandise like that imported here, as "Either lag screw or lag bolt. They are both the same. Some call them 'bolt'; some call them 'screw.'" This witness stated that he had received orders for the imported articles from the appellee, and that in such orders they designated the desired articles as "lag screws." He further stated that he had never seen the term "wood screw" used for "lag screw."

In addition to this oral testimony, a stipulation of counsel was filed which, among other things, stipulated the articles to be composed of "either iron or steel."

Samples, also, of the imported articles are in evidence, and are known as Exhibits 1 and 2. The imported articles are of ⅜-inch steel, approximately 2½ inches in length, having a square chamfered head ½-inch square, without a slot, with a coarse screw end extending 1¼ inches in length, the screw thread being sharp ended and gimlet-like.

As this case is presented here, Government counsel go upon the theory that the sole issue is between paragraphs 330 and 397, it being the theory of the Government that no issue can now be raised as to the classification of the imported articles as wood screws under said paragraph 338, because of the failure of the importer to cross appeal. The entry papers show that the imported goods weighed 3,680 pounds, which would make a duty under said paragraph 330 of $36.80. At a duty rate of 25 per centum ad valorem on a valuation of $307, under said paragraph 338, the duty would amount to $76.75; hence, if, as a result of the consideration of the matter by this court, the claim under said paragraph 338 is sustained, a higher rate of duty will be imposed upon the goods than was imposed by the judgment of the court below. In other words, the judgment would be more unfavorable to the importer than it was before appeal was taken. The Government counsel, we think, are in error in their claim that the applicability of said claim under paragraph 338 is not now before this court. The rule, as laid down in many cases, is that the party receiving a favorable judgment on one claim in the court below, where several claims are interposed, may not have the benefit of a better judgment in the appellate court unless such party has affirmatively asked for the same by cross-appeal. However, wherever a claim is made in a protest which does not afford to the original protestant a more favorable judgment, if it be sustained in the appellate court, such claim may be made and passed upon in the appellate court on the appeal of the other party, without the assignment of cross-errors. While the authorities may not have directly announced this principle in so many words, we think it may be safely gathered from the authorities that such is the rule. The last pronouncement of

this court on that subject is found in *United States* v. *Paramount Publix Corp.*, 22 C. C. P. A. (Customs) 452, T. D. 47453, where the importer made two claims under paragraph 372 of the Tariff Act of 1930, one for a rate of 25 per centum ad valorem as printing machinery, and another for a rate of 27½ per centum ad valorem as all other machines, and this court, on appeal, reversed the allowance of the claim under the 25 per centum rate, and allowed the importer's claim under the 27½ per centum rate, all upon the Government's appeal. See, also, *United States* v. *Von Oefele*, 4 Ct. Cust. Appls. 284, T. D. 33492, and *United States* v. *Pyrometer Instrument Co.*, 21 C. C. P. A. (Customs) 376, T. D. 46910, and cases therein cited.

We, therefore, conclude that the question is now before this court as to whether the imported articles were properly classified by the collector as manufactures of metal, or whether they were bolts, as held by the trial court under said paragraph 330, or should be classified as "Screws, commonly called wood screws," under said paragraph 338.

The testimony of the witnesses, the substance of which has been stated, *supra*, related to the common meaning of the phrase "wood screws" and not to commercial designation. Testimony as to the common meaning of a term is, of course, not binding upon the courts but may be looked to by them as advisory and may be accorded such weight as the courts deem proper in connection with the definitions of such terms given by the lexicographers.

In the instant case, in view of the use of the unusual phrase "commonly called" it is deemed proper also to refer to any available legislative history and to consider whether there has been legislative adoption of any judicial construction of the term.

It has been brought to our attention that paragraph 169 of the tariff act of 1897 provided for "screws commonly *called* wood screws * * * " and that the phrase has been repeated in all subsequent tariff acts [italics ours]. It further appears that in a case, T. D. 25711, 8 Treas. Dec. 492, arising under the 1897 act, where certain unusual "screw spikes" were involved, the United States General Appraisers (now the United States Customs Court) said:

Screw spikes are new to this country, although in use for many years in Europe. They are made in peculiar form to suit the purpose for which they are intended— *i. e.*, to fasten rails to ties, taking the place of spikes. The articles have a square head on a round shoulder, and are screwed into the ties by means of a wrench, very much after the manner of inserting lag screws. They have neither slots nor points, and differ in every essential feature from the well-known articles commonly called wood screws. As the provisions of paragraph 169 are expressly limited to screws commonly known as wood screws, the articles here in question clearly do not fall within that paragraph. * * *.

We construe the foregoing as a judicial holding that the phrase "commonly called wood screws" meant, in the tariff act of 1897,

"screws commonly known as wood screws," and, since the phrase "commonly called" applied to wood screws has been used in all tariff acts passed since that decision (in 1904), we are of the opinion that there has been legislative adoption of such judicial interpretation.

It has been suggested that the decision, T. D. 25711, *supra*, is also an adjudication that only screws having slotted heads fall within the designation "screws commonly called wood screws," but to this we do not agree, particularly in view of numerous definitions of lexicographers hereinafter given. The General Appraisers were there dealing with unusual articles, "new to this country," and certain points of difference between them and screws commonly called wood screws, or commonly known as wood screws, were pointed out. Indeed it was said that they differed "in every essential feature."

The opinion did not attempt to define the term "wood screws." It enumerated features which were thought generally to be found in articles commonly called wood screws, but did not hold that the absence of any particular feature would necessarily remove an article from the category of articles commonly called wood screws. In other words, there is no statement that a screw was not commonly called a wood screw unless slotted.

When we turn to the definitions and descriptions by standard authorities, it seems clear to us that there is a class of screws, commonly known as wood screws, in which general class are embraced various types having different kinds of heads and dimensions with different numbers of threads per inch, and that these types have names or designations which in many cases are used interchangeably, and we find no sound reason for believing that it was the intention of Congress to narrow the meaning of the phrase "commonly called" to any particular type falling within the general class. If compelled to pick one particular *type*, as distinguished from others of the same general *class*, it would seem that great difficulty in decision would be encountered, and the provision for "screws commonly called wood screws" might be rendered well-nigh meaningless—a thing Congress could not have intended.

Webster's New International Dictionary, 1932, defines wood screw as follows:

A pointed metal screw formed with a sharp thread of comparatively coarse pitch, for insertion in wood. The head is usually slotted for turning with a screw driver. Called also *screw nail*.

One of the leading authorities is Knight's New American Mechanical Dictionary, 1882 and 1883, p. 954. This work defines "wood screw" as follows:

A *square-headed* screw with a coarse thread for fastening together wooden frames. [Italics ours.]

Wood screws . . . Scientific Amer., XI, 24.

The Century Dictionary, Vol. 10, p. 6969, thus defines "wood-screw":

A screw specially made for use in fastening together parts of wooden structures or structures of wood and metal. The modern wood-screw has generally a conical point, like that of a gimlet.

Quite often the expression "wood screw" is used interchangeably with the term "lag screw," as is shown by the following definition from Oxford Dictionary, Vol. VI, p. 26:

lag-screw, (a) a flat-headed screw used to secure lags to cylinders or drums; (b) U. S.—*coach screw*. 1873. J. Richards *Wood-working Factories* 26. Almost any kind of shafting can be hung with safety on wood screws, or lag screws, 1875 Knight *Dict. Mech.*, *Lag-machine*.

In Machinery's Encyclopedia, Vol. V, pages 324, 327, 328, we find definitions and descriptions deemed particularly pertinent here as to both wood screws and bolts. At page 324 it is said:

Screws and Bolts. Screws and bolts are used in mechanical work for holding two or more pieces together in a fixed position, or as a means of transmitting motion, as when adjusting one part relative to another. They may be divided into a number of *classes* each of which is particularly applicable to a certain kind of work. These *classes* are known as machine screws, cap-screws, studs, set-screws, bolts, and *wood-screws*. These general classes contain *different forms or types*, owing to variations in the shape of the head, etc. [Italics ours.]

Each of these general classes so named is then described and individual types are given, many of them being illustrated pictorially. Of bolts, the general statement is made:

Bolts.—The difference between a bolt and a screw, according to the *generally accepted meaning* of the term, is that nuts are used on bolts, whereas screws are inserted into tapped holes; there are exceptions, however, to this *general* classification   *   *   *   [Italics ours.]

A number of pictorial illustrations of bolts are given, no one of which shows a gimlet-like point or otherwise bears much resemblance to the exhibits on file.

Wood screws are quite specifically discussed and illustrated, thirteen different forms, or types, being shown under designations such as "headless," "dowel," "flat head," "oval head," "round head," etc. The last of the illustrations given under the general head of wood screws consists of a picture which, except for the number of threads (a matter immaterial here), might well be taken as a picture of the pertinent exhibits at bar. It is designated "coach or lag screw" and the text states that it "has a square head instead of a slot, so that it can be turned by a wrench."

While we are not disposed to give any great weight to the testimony presented here relating to common meaning, it is noted that such testimony harmonizes quite fully with the definitions and de-

scriptions of wood screws given by the authorities quoted and with the statements relative to interchangeable terms as to certain types. Two of the types illustrated—the "headless" and the "dowel"—have no heads, and three of the other types—the "pinched head," the "winged," and the "Rogers flat head drive"—like the "coach or lag screw" show no slots in the heads. All these, however, are placed by this authority within the general class of wood screws.

Upon the question of the articles being bolts, in the sense of the tariff act, we do not feel that the contention can be sustained under the definitions of that term and the testimony adds nothing to the definitions to which we feel any weight should be given. Accordingly, we think it must be held that the importer failed to sustain the burden of showing the articles to be bolts, and that the trial court erred in granting its claim under paragraph 330, *supra*.

We are further of opinion, for the reasons stated, that the trial court also erred in denying importer's claim under paragraph 338, *supra*.

The judgment of the United States Customs Court is *reversed* and the cause *remanded* for further proceedings consistent with the views herein expressed.

### DISSENTING OPINION

LENROOT, Judge: I respectfully dissent from the conclusion reached by the majority in this case. The court, as I construe the opinion, holds that the articles here involved are in fact "wood screws" within the common meaning of those words, of which we may take judicial notice, and are therefore classifiable under paragraph 338 of the Tariff Act of 1930; and also that the record indicates that the articles are "commonly called wood screws."

Paragraph 338 of said act reads:

PAR. 338. Screws, commonly called wood screws, of iron or steel, 25 per centum ad valorem.

Had it been the intention of Congress to embrace within the paragraph all screws coming within the common meaning of the term "wood screws," then it seems to me that Congress would simply have used the words "screws, commonly known as wood screws"; but when Congress made the qualification, "commonly called," I think it is clear that it did not intend that all screws coming within the broad meaning of the term "wood screws" should be classified under the paragraph, but only such as were commonly called wood screws; and that such screws as were commonly called by other names should not be included in the paragraph.

If this be true, and I see no escape from this conclusion, then it became a matter of proof as to whether the articles here involved are

"commonly called" wood screws; and the ordinary rule as to burden of proof and preponderance of evidence is applicable.

In the case at bar the Government offered no evidence, all of the evidence taken having been introduced by the appellee. The burden was upon appellee to establish that the articles were commonly called wood screws.

The first witness called was one Frank J. Mano, the manager of appellee. He testified as follows:

Q. Under what name or names do you purchase Exhibits 1 and 2?—A. Under lag bolts, under coach screws, under lag screws.

Q. *Any others?*—A. *No.* [Italics mine.]

He testified further that they are used solely in wood, and that they are also called wood screws.

Oscar Linke, another witness in behalf of appellee, whose trade was that of manufacturing bentwood chairs, testified with respect to the articles in question as follows:

Q. Under what names have you known Exhibits 1 and 2 during the course of your years of experience?—A. Exhibits 1 and 2, I refer to them the same as the salesman that comes around. Some call it lag bolt; some call it lag screw; some call it coach screw. But it has always the same meaning; it is this screw.

Q. Those names are used interchangeably as regards these particular articles, Exhibits 1 and 2?—A. Yes; those names are known. If a salesman comes around and he offers it as lag bolt or offers it as coach screw, whatever expression he uses, I know it is this screw.

There was no testimony by this witness that the articles were ever called "wood screws."

The last witness for appellee was one Edward A. Derby, a salesman for the National Screw and Manufacturing Co., who had been such salesman for twenty years. He testified in part as follows:

Q. To what class of purchasers have you sold articles like Exhibits 1 and 2?—A. Why, to the wholesale hardware trade, nail supply, furniture manufacturers, piano manufacturers, the pole-line hardware trade, people that supply every telegraph and telephone company.

Q. Under what names have you sold merchandise like Exhibits 1 and 2?—A. Either lag screw or lag bolt. They are both the same. Some call them "bolt"; some call them "screw."

Upon cross-examination the witness testified:

X Q. Have you ever seen the term "lag screw" used for "wood screw", or vice versa?—A. Have I what?

X Q. Ever seen the term "wood screw" used for "lag screw"?—A. No.

\* \* \* \* \* \* \*

X Q. When you refer to "lag bolt" or "lag screw", that is similar to Exhibits 1 and 2?—A. That is correct.

It will thus be seen that two of the importer's witnesses positively negative the claim that the articles are commonly called wood screws,

and only the manager of appellee, Mano, testified that they were called wood screws; but even he admitted that they were purchased under the names of lag bolts, coach screws, and lag screws, but never as wood screws.

The Customs Court weighed this evidence and found that the articles are not commonly called wood screws, but are known as lag screws, coach screws, and lag bolts.

I submit that if this were an action at law, tried before a jury, and the jury should find upon the testimony in this record that the articles were commonly called wood screws, the court would unhesitatingly set the verdict aside as being against the overwhelming weight of the evidence.

It is therefore clear to me that, if the words of the paragraph "commonly called" are to be given any significance, the burden was upon appellee to establish that the articles were "commonly called 'wood screws.'" Its own testimony fails to establish this, the trial court so found, and we cannot, without doing violence to well-established rules, set aside that finding.

The term "commonly called" is most unusual in tariff legislation. I have found it in no provision of our tariff laws, present and past, other than provisions for "screws," and this fact is persuasive that Congress in the deliberate use of such words intended thereby to narrow, for the purposes of duty, the dictionary definitions of "wood screws."

Moreover, I submit that there has been legislative adoption of judicial determination that the words "commonly called wood screws," do not include all screws coming within the common meaning of the words "wood screws."

Paragraph 169 of the tariff act of 1897 provided for "Screws, commonly called wood screws, * * *" being the identical language used in paragraph 338 of the Tariff Act of 1930. In 1904 the Board of General Appraisers (now the United States Customs Court) construed the phrase "commonly called wood screws," T. D. 25711, 8 Treas. Dec. 492. "Screw spikes" were there involved. The board in its opinion stated:

Screw spikes are new to this country, although in use for many years in Europe. They are made in peculiar form to suit the purpose for which they are intended— i. e., to fasten rails to ties, taking the place of spikes. The articles have a square head on a round shoulder, and are screwed into the ties by means of a wrench, very much after the manner of inserting lag screws. They have neither slots nor points, and differ in every essential feature from the well-known articles commonly called wood screws. As the provisions of paragraph 169 are expressly limited to screws commonly known as wood screws, the articles here in question clearly do not fall within that paragraph. * * *

I would first observe, with respect to this decision, that screw spikes such as were there involved would, under the majority opinion in this case, unquestionably be classified as "wood screws," for such screw spikes clearly come within the broad definition of wood screws found in some of the dictionaries relied upon by the majority. Furthermore, in the case last cited, it was judicially determined that screws "commonly called wood screws" have slots and points. While the screws here involved have points, it is conceded that they do not have slots.

It having been judicially determined that screws commonly called wood screws have slots and points, and Congress having in every tariff law since 1897 used the same phrase, "Screws, commonly called wood screws," without modification, I submit there has been legislative adoption of judicial determination that screws commonly called wood screws must have slots, which the screws here involved have not.

The majority opinion relies upon said decision to establish that there has been legislative adoption of a judicial decision that the words "commonly called" are synonymous with the words "commonly known." That question, so far as the decision discloses, was not in issue before the board, was not discussed, and the majority opinion in this case relies wholly upon the fact that the board in its decision, evidently inadvertently, used the term "commonly known" instead of the statutory words "commonly called."

While treating as authoritative this expression of the board upon a question not in issue before it and not discussed by it, the majority declines to give any weight to the pronouncement of the board that the screws there involved had no slots, thereby clearly implying that screws commonly called wood screws have slots. I am unable to understand why weight should be given to an expression of the board upon a question not before it, and no weight is given to an expression of the board upon a question directly there in issue.

Moreover, even assuming that the words "commonly called" should be construed as synonymous with the words "commonly known," I think the court has placed too great a reliance upon the scientific definition of the term "wood screws." I say this in view of the decision of this court in the case of *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436, in which the importer contended that tunny fish were in fact mackerel and dutiable as such. It was conceded that, upon dictionary definitions and the testimony in the case, the tunny fish is a member of the mackerel family. The court held that, for tariff purposes, the term "mackerel," as it is popularly understood and ordinarily used, does not include the tunny fish. In its opinion the court said:

Without doubt the tunny is, scientifically speaking, a member of the mackerel family, and that scientific classification is unquestionably recognized by most, if not all, modern dictionaries. Nevertheless, the fact remains that such a classification is purely scientific and can not be accepted as determinative of the common, ordinary, and popular meaning of the term "mackerel." * * * As tariff acts are drafted not in the terms of science, but in the language of commerce, which is presumptively that in common use, it follows that even if the tunny fish be a mackerel according to scientific terminology, it can not be classified as such for customs purposes unless it be popularly or commercially so regarded. * * *

So in the case at bar, while the screws here involved may fall under a broad dictionary classification of wood screws, I venture to say that it is a matter of common knowledge that they are neither commonly called nor commonly known as such. I do not believe that any hardware store in the country would sell, or any purchaser call for, such screws as wood screws, but always under some other name, and the testimony in the record abundantly supports this assertion. Such testimony is in accordance with what seems to me is a matter of common knowledge, and, if there be any doubt about it, said testimony should be given weight as advising the court upon the subject. Instead of this, it seems to me that the majority chooses to rely upon dictionary definitions and scientific works which are in themselves only advisory and never controlling upon the court, and holds that the testimony in the case harmonizes with such definitions. I agree with the trial court that the testimony in the case, if to be considered at all, clearly shows that the involved screws are not wood screws within the provisions of paragraph 338.

I agree with the majority that, upon the record made, and especially upon the samples of the merchandise in evidence, the articles here involved are not bolts provided for in paragraph 330.

It follows that, in my judgment, the collector correctly classified the merchandise under paragraph 397, and the judgment of the Customs Court should be reversed without remand of the case.